ARKANSAS MUTUAL FIRE INSURANCE COMPANY *v.* CLAIBORNE.

Opinion delivered March 11, 1907.

1.  INSURANCE—APPLICATION—NOTICE.—A fire insurance company cannot complain that an application for a policy on a certain building alleged that the building was a combined rooming and dwelling house, consisting of twenty-four rooms, and that the rate for a dwelling house was paid, when the application should have stated that the building was a hotel, for which a higher rate of insurance was payable; if the rate charged was too low, the company was to blame, as the application correctly described the house. (Page 156.)

2.  SAME—ALTERATION OF PREMISES—NOTICE.—Though a policy of fire insurance provided that the policy should be avoided "if mechanics be employed in building, altering or repairing the within described premises for more than 15 days at one time, the insurance company cannot claim a forfeiture on this ground where it was

notified of the alteration, and amended its policy to conform thereto. (Page 157.)

3. SAME—FORFEITURE—WAIVER.—An insurance company will be estopped to take advantage of a stipulation contained in a policy issued by it limiting the amount of concurrent insurance on the property insured if it was informed by the insured that he was carrying a larger amount of concurrent insurance than stipulated, and it never objected thereto until after a fire, nor offered to cancel its policy or to refund the unearned premium. (Page 158.)

4. SAME—ACQUIESCENCE BY SILENCE.—Where the insured informs the insurance company that he has taken out additional concurrent insurance in excess of the amount limited by the policy, and asks the company to give its consent to such additional insurance or return the unearned portion of the premium, the company cannot remain silent if it desires to insist upon the forfeiture. (Page 161.)

5. SAME—NOTICE TO OFFICER.—Notice to the vice president of an insurance company is notice to the company. (Page 163.)

6. SAME—ACTION ON POLICY—DAMAGES AND ATTORNEY'S FEES.—The act providing that where an insurance company fails to pay a loss within the time required in the policy the company shall be liable, in addition to the amount of the loss, to 12 per cent. damages and attorney's fees (Acts 1905, p. 308) does not apply to losses which occurred before the passage of the act. (Page 163.)

Appeal from Garland Circuit Court; *Alexander M. Duffie,* Judge; affirmed.

### STATEMENT BY THE COURT.

In April, 1903, D. W. Claiborne made an application to the Security Mutual Fire Insurance Company of Little Rock, Arkansas, for three thousand dollars insurance on property in Hot Springs, Arkansas.

In the application for the insurance which he filed with the company the property is described as a "combined rooming and frame dwelling house" having twenty-four rooms, with the furniture, bedding, etc., contained therein. The application was made on a printed form with printed questions. To the question, "Are you the sole owner of the property to be insured?", there was no answer, the space for the answer being left blank. To the question, "In whose name is the title to the land on which said building situated?" the response was, "D. W. Claiborne."

The Security Mutual did not desire to carry all the insurance, so it turned over half of the insurance to the Arkansas

Mutual Fire Insurance Company, and that company issued to Claiborne its policy of insurance for $1,500 upon the property for a term of three years; $1,000 on the house and $500 on the furniture, the house being described in the policy as a two-story frame building occupied as "a dwelling house." The policy permitted $3,000 concurrent insurance, including the amount of the policy. Claiborne and his family lived in part of the house, and the rooms not used by them were rented to those desiring rooms.

In the latter part of 1904 Claiborne added another story to the house, making it a three-story house having about forty rooms, and thereafter it was used as a hotel.

About the time this addition was made to the house, Claiborne took out four thousand dollars insurance on the same property in other companies. Afterwards, about the first day of January, 1905, Claiborne was killed. At the time of his death he was on his way to Little Rock to have the policy amended so as to permit this concurrent insurance taken out by him. After his death his son went to Little Rock and had some negotiations with the officers of the company in reference to amending the policy so as to permit this additional insurance and to show that the property belonged to Mrs. M. A. Claiborne, widow of D. W. Claiborne, and to change the policy to her name. After the death of Claiborne his wife took out in another company $500 additional insurance on the property. His son, W. L. Claiborne, acting as the agent of his mother who was then the owner of the property, applied to the company to have its policy amended so as to show that Mrs. Claiborne was the owner of the property, and that the company had consented to the additional insurance which had been taken on the property. A few days later the company mailed the policy to Claiborne with the following amendment:

"Mrs. M. A. Claiborne. Amendment to Policy No. 2077.

"D. W. Claiborne, the original owner of the property, being now deceased, Mrs. M. A. Claiborne, as administratrix of the property of D. W. Claiborne, is hereby named as assured under this policy. This policy is further amended to correct description of property as follows: It is understood that the property insured hereunder covers the three-story shingle-roofed frame

building and its contents as above described and located at 305 Ouachita Avenue, Hot Springs, Ark.

"Attached to and made a part of policy No. 2077 of this Company.

"Little Rock, Arkansas, January 21, 1905.

"THE ARKANSAS MUTUAL FIRE INS. COMPANY,

"By C. S. Collins, Secretary."

This amendment did not refer to the matter of additional insurance, and Claiborne continued his negotiations with the company, but no further amendment was made.

On the 25th day of February, 1905, a fire in Hot Springs got beyond control, and in the general conflagration which followed several hundred houses were destroyed, among them the house of Mrs. Claiborne and the contents thereof. The fire did not originate in her building, and she was in no way to blame for it.

Mrs. Claiborne made out proofs of loss, and submitted them to the different companies in which the property was insured, but the defendant company refused to pay, and Mrs. Claiborne brought suit in the Garland Circuit Court to recover the amount of the policy. The defendant company filed an answer, in which is set up that D. W. Claiborne, who made application for the policy, perpetrated a fraud on the company by pretending in his application that the house was a dwelling house, when in fact it was a hotel; that by so doing he procured the insurance at $1.50 per thousand when it should have been $3.75.

It is further alleged that the intestate Claiborne and plaintiff took out a larger amount of concurrent insurance than was permitted by the policy without knowledge or consent of the defendant company, and that this avoided the policy.

On the trial there was a verdict in favor of the plaintiff, and defendant appealed.

*C. S. Collins*, for appellant.

1. The court erred in giving instructions 1 and 2. No sufficient proof is shown of notice to the company as to the breaches of the contract. A mere clerk in the office could not bind the company. 62 Ark. 353. And mere silence after knowledge of a forfeiture is not a waiver. 65 Ark. 240. It is

set out in the policy that full power is vested in an executive committee of three, consisting of the president, secretary and treasurer, to authorize the issuance of a policy or to materially amend it. Thompson, the vice-president, though acting as president in the absence of the latter, could not bind the company without the concurrence of at least one other, and the holder of the policy was bound by that provision of the law. 62 Ark. 49.

2. The third and fourth instructions given were erroneous and misleading; the third because it gave the impression to the jury that if the company knew that plaintiff was carrying any larger amount of concurrent insurance than stipulated, though not knowing that the amount had been increased to $7,500, the forfeiture was thereby waived, and also because it, in effect, tells them that mere silence, and failure to cancel the policy, after obtaining such information, would estop. The fourth proceeds upon the theory that failure to at once return the unearned premium confirmed the policies regardless of all other facts. 64 Neb. 808; 2 Cooley's Dig. 1439; 9 Metc. (Mass.) 205; 7 Cush. (Mass.) 175; 33 N. H. 9. The by-laws of a mutual company may fairly be regarded as part of the contract, so as to continuing warranties. 4 Cooley's Dig. 1476; 11 Ia. 21; 113 Mich. 158; 71 N. W. 576; 133 Mass. 85; 14 Gray, 203; 81 Am. Dec. 689; 65 N. Y. 21.

3. This court has not yet decided that an insurance company may not stipulate with the assured that any amendments *after* the policy has issued must be made in the way mutually agreed upon between the parties to the contract. See 52 Ark. 11; 53 Ark. 222; 58 Ark. 278; 71 Ark. 242; *Id. 292*; 62 Ark. 349.

4. The evidence developed that suit had been in the name of M. A. Claiborne brought upon a contract in favor of D. W. Claiborne. A suit at law should not have been permitted without first reforming the contract in a court of equity. *Northern Ass. Co. v. Grand View Bldg. Ass'n.* Adv. sheets U. S. S. Ct., Dec. 1, 1906.

5. There was no waiver pleaded in the complaint, and it was error to admit the testimony of W. L. Claiborne tending

to prove a waiver.  Waiver must be pleaded and proved.  32 Neb. 490; 96 N. W. 604.

*Hogue & Cotham,* for appellee.

1.  There is no ground for the charge of fraud in the application.  It showed that the house was described as a "combined rooming and framed dwelling house," and that the house contained twenty-four rooms.  The company could not have been misled or deceived as to the character of property insured.

2.  As to the violation of the concurrent insurance clause, under the facts in this case appearing in the testimony, appellant undoubtedly waived any forfeiture incurred by reason of the issuance of insurance on the house in excess of the amount stipulated.  75 Ark. 98.  And the jury having passed upon the facts, their verdict, based upon legally sufficient evidence, will be sustained.  46 Ark. 142; 51 Ark. 467; 56 Ark. 314; 19 Ark. 118; *Id.* 123; 23 Ark. 51.

3.  The contention that waiver must be pleaded is inconsistent with the statute.  Kirby's Digest, § 6137.

4.  There is no proof of any by-law to the effect that only a majority of an executive committee of three had power to authorize the issuance of a policy, or to materially amend it, but this is immaterial since the weight of authority denies the distinction between mutual and stock companies with reference to the power of officers and agents to waive conditions and estop the company from insisting upon forfeitures.  Richards on Ins., par. 76.

5.  Plaintiff's motion for judgment for attorney's fee and 12 per cent. damages should have been sustained.

*C. S. Collins,* for appellant in reply.

1.  On the question of waiver, appellee's counsel misapplies the statute relied on.  Correct practice should require the waiver to be pleaded, if intended to be relied upon.  For additional authorities see 3 Cooley's Briefs on Ins. 2768; 23 Ind. App. 121; 53 N. E. 787; 77 Am. St. 414; 7 B. Mon. 470.

2.  As to distinction between mutual and stock companies, see 64 Neb. 808; 2 Cooley's Briefs on Ins. 1439, 1476; 9 Metc. (Mass.) 205; 7 Cush. (Mass.) 175; 33 N. H. 9; 11 Ia. 21; 113

Mich. 158; Richards on Ins. 76; 133 Mass. 85; 14 Gray, 203; 81 Am. Dec. 689; 1 Beasley, 333; 65 N. Y. 21.

3. The motion for attorney's fee and 12 per cent. penalty was properly denied. The contract and loss both occurred before the date of the act relied on, and the liability, if any, dates from the time of the loss.

RIDDICK, J., (after stating the facts.) This is an appeal by an insurance company from a judgment rendered against it on a policy of insurance against fire issued by it.

The first contention of the defendant company is that Claiborne, who was an insurance agent, perpetrated a fraud upon the insurance company in his application for the policy by pretending that the building on which he applied for insurance was a dwelling house when in fact it was a hotel. But in the application, which by the terms of the policy is made a part thereof, Claiborne described the property as a combined rooming and frame dwelling house, having two stories and containing twenty-four rooms. This description shows that Claiborne did not represent the building to be an ordinary dwelling, and the testimony shows that at the time he made the application the house was not used as a hotel but as a home for his family and for persons to whom he rented rooms, some of whom boarded with his family. Shortly before Claiborne's death the house had been changed to a hotel. The evidence tends to show that, so far as insurance rates are concerned, there is no material difference betwn a rooming house containing as many as twenty-four rooms and a hotel; and if the rates on which this policy was issued were too low, the company itself was to blame, as the application gave substantially a correct description of the house.

But this matter is immaterial now for another reason. After Claiborne died one of his sons, W. L. Claiborne, went to the home office of the company, and had some negotiations with the company in reference to a change in the policy affecting among other things the description of the building. The company made an amendment to the policy and mailed it along with the policy to W. L. Claiborne, who was acting for his mother, who was in fact the owner of the property. This amendment contains the following language: "It is understood that the property insured hereunder covers the three-story shingle-roofed frame building

and its contents as above described." Now, the amendment shows that the company had been informed that another story had been added to the building, and that it amended the policy so as to cover the building in its altered shape. The application for insurance made before the alteration showed that the building had twenty-four rooms, and with another story added the company must have known that it then probably contained several more rooms. It did in fact after the alteration contain forty rooms, and the company either knew this or could have learned it by making inquiry. Having been put on inquiry by the information that another story had been added to the building, we must presume that the company knew the number of rooms it contained. Now, the application of Claiborne for insurance stated among other things that his total wealth was less than $15,000. It would be such an unusual thing for a man owning no more than that to build a house of forty rooms exclusively for a dwelling house that we cannot conclude that this comapny at the time they made this amendment to the policy believed that it was insuring a building used for a dwelling house only. We should reach this conclusion, even if W. L. Claiborne had not testified that at the time he asked for the amendment to the policy he informed the officers of the company of the extensive alterations that had been made on the building, and told them that it had been changed from a rooming house to a hotel. With this information they made the amendment referred to, and thus recognized and treated the policy as still valid, and can not now claim a forfeiture on that ground.

These same reasons dispose of the contention that the policy was avoided because a provision of the policy that it should become void "if mechanics be employed in building, altering or repairing the within-described premises for more than fifteen days at any one time." There is no direct proof that this provision of the policy was violated, but from the extensive repairs and alterations made we think it quite probable that mechanics were engaged for more than fifteen days in making these alterations. But, as the company was informed of the alterations, it must have known or had reasonable grounds to believe that workmen had been engaged in the building for more than fifteen days. But, though the company must have known this, it treated the

policy as valid by returning the policy amended so as to cover the building in its altered form, and thus led the insured to believe that the policy was still in force. It is too late now to change front and assert to the contrary.

We will next consider the question as to whether there was a forfeiture of the policy by reason of the fact that the insured took out more concurrent insurance than was permitted by the stipulations in the policy. The policy permitted $3,000 concurrent insurance, including the amount named in the policy. The evidence showed that the insured, Claiborne, after making the alterations in the building, took out $4,000 insurance on the building in other companies. This was in December, 1904. After his death his wife, Mrs. M. A. Claiborne, took out additional insurance to the extent of $500. The date of this policy is not shown, but the evidence shows that these policies were issued by the following companies, the Germania, Ozark, Caledonian and German of Freeport, and we infer from the evidence that it was issued soon after Claiborne's death, and before the negotiations which took place between W. L. Claiborne and certain officers of the company. W. L. Claiborne says that he first went to the home office of the company on the 17th of January, 1905; that he met the auditor and ex-officio vice-president of the company, told him that his mother was the owner of the property, and explained to him the amendments of the policy which he desired to have made, and that the vice-president replied that the matter would be attended to; that a few days later he (Claiborne) received the policy with the amendment set out in the statement of facts, and which made the policy payable to Mrs. M. A. Claiborne as administratrix, and changed the description of the building from a two to a three-story building, but made no reference to the matter of concurrent insurance. According to Claiborne's testimony, he again returned to Little Rock and called at the home office of the company with the policy about the 10th or 15th of February, 1905, and met the vice-president again, and again told him that his mother was now owner of the property, and that he desired to make her the assured in the policy, "and," said the witness, "I told him at the time I asked for those amendments, one was for $5,500 on the house total concurrent on the house,

and one was for $2,000 total concurrent on the furniture, making the sum total $7,500 on the building and contents; and I told him, enumerated over to him, the other insurance companies that carried additional insurance—the Ozark, the Caledonian, German of Freeport and the Germania, and I made a detailed statement to him of the amount of insurance we had, and who we wanted to make insured in the policy." The witness further stated that the vice-president said that the president would be back next day, and that if witness would see him he would make all necessary amendments. The witness did not state whether he waited to see the president or not, but we infer that he did not. For he says that afterwards the policy was returned without the amendments, and that he returned to Little Rock the third time, and again requested the officers of the company to take action, and that he could not get either the unearned premium returned or the amendments made, but on the third visit he was again assued by the vice-president that the amendments would be made. But that, notwithstanding these assurances, the policy was returned a few days before the fire with no other amendment than the one first made.

Now, the policy contained a stipulation that it might be cancelled at the request of the assurred or by the company giving notice of such cancellation. It further provided that if the policy should be cancelled, or if it became void or ceased by reason of violations of the contract on the part of the assured, the unearned portion of the premium should be returned on the surrender of the policy, the company retaining the customary short rate and expenses. The evidence showed that the assured and his wife had taken out $4,500 additional insurance in other companies, which with the three thousand in the Security Mutual and the Arkansas Mutual made $7,500 total insurance. We understand from the testimony of the witness, a part of which is quoted above, that he informed the vice-president fully of these facts, and requested him to have amendments made showing that the company consented to this concurrent insurance, telling him at the same time if the amendments could not be granted to return the unearned portion of the premium. It is true that this testimony was contradicted by witnesses for the company, but the verdict of the jury shows that they found

against the company on that evidence, and we must now take the facts testified to by this witness as true. Assuming then that this witness gave the vice-president of the company a detailed statement of the other insurance taken out by the insured and requested an indorsement on the policy showing that the company consented thereto, it became the duty of the company to either comply with his request or to tell him frankly that it would not do so, but would treat the policy as void and return the unearned portion of the premium as required by the policy. It did not do this, but instead it made an amendment on the policy partially complying with his request, and returned it to him. When informed that this amendment was not sufficient, the vice-president of the company assured him that the amendment would be made, but after keeping the policy a few days it returned it to him again making no further amendment, but without any notice to him that it considered the policy as void.

In a recent case it was said that a waiver may be founded upon an estoppel, but it is not so necessarily. Though the conduct of the insurer may not have misled the insured to his prejudice or into an altered position, yet if, after knowledge of all the facts, its conduct has been such as to reasonably imply a purpose not to insist upon a forfeiture, the law, leaning against forfeitures, will apply the peculiar doctrine of waiver, invented probably to prevent them, and will hold the insurer irrevocably bound by an election to treat the contract as if no cause of forfeiture had occurred. *Alabama State Mut. Ins. Co.* v. *Long,* 123 Ala. 667. If the jury believed the facts testified to by the witnesses for plaintiff, they were justified in finding that there was a waiver of all the forfeitures set up in the answer, and in finding a verdict for plaintiff. Counsel for defendant contends that, if the company charged the customary short term rates, there was under the facts of this case no unearned premium to return, but we consider that as not very material in this case. The insurance on this policy for a term of three years had been paid in advance. Not much over half of this time had expired at the time this additional assurance was taken out. If the company insisted on that as a forfeiture, it was not unreasonable that the insured should expect a part of this premium to be returned as unearned. The policy had been delivered to the

company with a request that it make an indorsement thereon showing that it consented to the additional insurance. If it intended to insist on the forfeiture, it was unnecessary to have returned the policy. And if it returned the policy, it should have informed the insured of its intention to insist on the forfeiture, and given an explanation of why no part of the premium was returned. As it sent the policy to the insured without returning any part of the premium or making any explanation in reference thereto or making any claim that it considered the policy as void, and without stating any objections to the additional insurance of which it had been informed, this conduct was calculated to mislead the insured and cause a belief that the company did not intend to insist on the forfeiture, and the case comes squarely within the recent decision in *German-American Insurance Company* v. *Harper,* 75 Ark. 98.

Again, it is said that there was error in the instructions given to the jury. In the first and third instructions given at the request of the defendant the court told the jury that "if the defendant company knew that the plaintiff was carrying a larger amount of concurrent insurance than stipulated, but never objected thereto until after the fire, nor offered to cancel the policy, the defendant will be estopped to take advantage of such stipulation."

Now, this statement of the rule is rather too broad, and, abstractly considered, is not a correct statement of the law. It might happen that knowledge that additional insurance had been taken out by the insured should come incidentally to the insurance company in such a way and under such circumstances that the insurance company would not be required to take action. In other words, it cannot be said that mere silence or non-action on the part of the company after obtaining knowledge of a forfeiture will under all circumstances amount to a waiver. But where silence or failure to act is calculated to mislead and does mislead the insured, then it will operate as a waiver. When a party is under a duty to speak, or where his failure to speak is inconsistent with honest dealings, and misleads another, then his silence may be deemed to be acquiescence. *German-American Insurance Co.* v. *Harper,* 75 Ark. 85; *More* v. *New York B. F. Ins. Co.,* 130 N. Y. 537; 2

May on Ins. § 508. So, where the insured informs the company that he has taken out adidtional insurance in violation of the terms of the policy, and asks the company to give its consent to such additional insurance or return the unearned portion of the premium, the company cannot then be silent if it desires to insist on the forfeiture. It cannot under such circumstances "sleep upon its intention to avoid the policy" while waiting to see if a loss will ensue or not; for if it does, and a loss happens, it may be too late to claim a forfeiture.

It was of such circumstances that the court was speaking in the case of *German-American Insurance Company* v. *Harper*, 75 Ark. 95. · In that case the agent of the company, after having been informed of the additional insurance, collected the premium on the policy which it had issued to the insured, thus recognizing the validity of the policy. The facts are not very fully stated in the opinion, but the opinion shows that the circumstances in proof were such that the conduct of the company in making no objection to the additional insurance until after the loss misled the insured, and caused him to rest in the belief that the policy was valid, and that he was protected. It thus appears that the notice to the company of which the court was speaking in that case was not a mere incidental notice from outside sources, but was given under such circumstances that called for action on the part of the company. But, while it seems from the instructions asked by the plaintiff and given by the circuit court in this case that there was a misconception to some extent of the decision of this court in the Harper case above referred to, yet we do not think that it was possible for those instructions to have misled the jury in this case. There was no evidence in this case of any notice to the company of the additional insurance except that given by plaintiff through her agents. There can be no question that, if given, this notice called for some action on the part of the company. The debatable question was not whether if this notice was given there was a waiver of the forfeiture, but whether any notice was in fact given. It was therefore not, under the facts of this case, prejudicial error for the court to tell the jury that if the company had notice of the additional insurance, "but never objected thereto until after the fire, nor

offered to cancel the policy," it would be estopped from insisting on a forfeiture on that ground.

The doctrine of waiver and estoppel, as applied to insurance contracts, is now too well established to require discussion. The courts apply these principles liberally to prevent injustice and fraud when the insured has been misled by the acts of the company or its agents. In this case, assuming that witnesses for plaintiff told the truth, it appears that the company was informed that the title to the property was in Mrs. Claiborne, that additions had been made to the building which greatly increased its value, and that other insurance had been taken. It made no objection, but on the contrary by its officers informed the insured that consent thereto would be indorsed on the policy. If it afterwards changed its intentions in that respect, honesty and fair dealing required that it should at once have informed the assured of that fact so she could have obtained other insurance. Its failure to object under such circumstances until after the loss must be taken as a waiver.

The contention that under the rules of the company its policies were issued and forfeitures waived only on the recommendation of a board and that this board had no notice does not alter the matter, for notice to the vice-president was notice to the company, and it should have required the board to act.

After due consideration thereof we find no prejudicial error in the instructions, and the judgment against defendant must be affirmed.

As to the appeal by the plaintiff, she contends that the court should have taxed the defendant with 12 per cent. damages and attorney's fees. But the policy was issued and the loss occurred before the passage of the statute permitting the court to add such penalty (Acts 1905, p. 308), and we agree with counsel for appellant that the amount for which the company was liable was not affected by the statute.

Judgment affirmed.